Frank McNEIL, William H. Washington, Sr., Rudolph V. Davenport, Howard Veal, Sr., and Archie Lawrence, Individually and representing all others similarly situated, Plaintiffs,

v.

CITY OF SPRINGFIELD, ILLINOIS, J. Michael Houston, Frank Madonia, James Norris, Ossie Langfelder, and J. Patrick Ward, as Mayor and Commissioners of the City of Springfield, Illinois, Defendants Counterplaintiffs,

v.

Frank McNEIL, William H. Washington, Sr., Rudolph V. Davenport, Archie Lawrence, and Howard Veal, Sr., Counterdefendants.

No. 85–2365.

United States District Court, C.D. Illinois, Danville Division.

Jan. 12, 1987.

As Corrected Jan. 14 and March 26, 1987.

James C. Craven, Don Craven, Peter Wise, Metnick & Barewin, Springfield, Ill., Samuel Issacharoff, Robert McDuff, and Richard B. Jerome, Washington, D.C., Charles E. Carter, Grover Hankins, Baltimore, Md., for plaintiffs.

William S. Hanley and Jane Lynk, Sorling, Northrup, Hanna, Cullen & Cochran, Fredric Benson and Robert M. Rogers, Corp. Counsel, The City of Springfield, Irv Smith, Bruce Stratton, Stratton, Nardulli & Lestikow, Springfield, Ill., Steve Bickerstaff, Austin, Tex., Lawrence DiNardo, Camille Olson, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BAKER, Chief Judge.

### I.  NATURE OF THE CASE

This is a class action in which the plaintiffs, the black citizens of the United States

above the age of eighteen years who are residents of the City of Springfield, Illinois, seek remedies for claimed violations of Section 2 of the Voting Rights Act of 1965, as amended June 29, 1982. Specifically, the plaintiffs claim that the structure of the government of the City of Springfield, Illinois, results in a denial or abridgement of the plaintiffs' right to vote on account of race or color. The plaintiffs further assert that, based on the totality of the circumstances, the political processes leading to nomination or election in the City of Springfield, Illinois, are not equally open to participation by the plaintiffs because the plaintiffs have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The individual plaintiffs representing the class are Frank McNeil, William H. Washington, Sr., Rudolph V. Davenport, Archie Lawrence, and Howard Veal, Sr. The defendants are the City of Springfield, Illinois, and J. Michael Houston, Frank Madonia, James Norris, Ossie Langfelder, and J. Patrick Ward, as Mayor and Commissioners of the City of Springfield, Illinois. Each of the individual defendants is white.

Jurisdiction is given to the court by 28 U.S.C. §§ 1331, 1343(3) and (4). There is no dispute as to jurisdiction.

The case was filed on April 2, 1985. After extensive discovery by the parties and a series of hearings pursuant to Fed.R.Civ.P. 16, the case concluded with eleven days of trial in December, 1986.

The issue presented for decision is: considering the totality of the circumstances, do the plaintiffs have an equal opportunity to participate in the political processes of the City of Springfield and to elect candidates of their choice to the city commission?

## II. THE APPLICABLE LAW

The plaintiffs have brought suit under Section 2 of the Voting Rights Act of 1965, as amended June 29, 1982, 42 U.S.C. § 1973. That Act, as amended, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in the denial or abridgement of the right of any citizens of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

To understand amended Section 2, the events leading up to its enactment should be noted. As originally enacted, Section 2 was a restatement of the Fifteenth Amendment and added little to the constitutional protections of the Fourteenth and Fifteenth Amendments. *See* S.Rep. No. 417, 97th Cong., 2d Sess. 19 (1982), U.S.Code Cong. & Admin.News 1982, pp. 177, 196 (hereinafter S.Rep. No. 417). Vote dilution challenges were generally made upon constitutional grounds. *See White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The case law, in particular *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973), *aff'd sub. nom, East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam), announced that the test

in a vote dilution case, whether brought on a statutory or constitutional basis, was one of "results," looking at the totality of the circumstances. Proof of discriminatory intent was not a prerequisite to a finding that an election system was unlawful. The test changed, however, when the Supreme Court, in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), held that proof of discriminatory intent was a necessary element of a vote dilution claim. The impact of *Bolden* was immediate. *See* S.Rep. No. 417, pp. 203–204.

Two years after the *Bolden* decision, Congress passed the amendments to Section 2. In *Thornburg v. Gingles,* — U.S. —, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), four years later, the Supreme Court had its first opportunity to interpret amended Section 2. In a case arising under amended Section 2 not only are the observations of the Supreme Court in *Gingles* pertinent, but also the observations of the three-judge district court whose opinion was accepted and affirmed by the Supreme Court. *Gingles v. Edmisten,* 590 F.Supp. 345 (E.D.N.C.1984), *aff'd sub. nom, Thornburg v. Gingles,* — U.S. —, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

The legislative history of the amendment to Section 2 clearly shows the statute's purpose. First, the amendment was in direct response to *Bolden*—the fundamental aim of the amendment was to eliminate intent to discriminate as an element of a statutory vote dilution claim. The Senate Judiciary Committee Report on the amendment states, "The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system of [sic] practice in order to establish a violation." S.Rep. No. 417, p. 205.

Section 2, as amended, adopted a results test which, irrespective of intent, requires assessment of the totality of the circumstances of the electoral process and a determination of whether that process resulted in cancelling out or minimizing the vot-

ing strength of racial groups. *Gingles v. Edmisten,* 590 F.Supp. at 353–54.

Second, the Congress intended that courts, in assessing the totality of the circumstances, should look to the interaction of the challenged mechanism with those historical social and political factors generally suggested as probative of dilution. *Id.* at 354. The Senate Report accompanying Section 2 lists those factors as:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417, pp. 206–207 (footnotes omitted).

Third, Congress intended that amended Section 2 should be interpreted in conformity with the statutory constructions of *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and its progeny. In that sense, the essence of racial vote dilution is this:

because of the interaction of substantial and persistent racial polarization in voting patterns ... a racial minority with distinctive group interests that are capable of aid or amelioration by government is effectively denied the political power to further those interests that numbers alone would presumptively ... give it in a voting constituency not racially polarized in its voting behavior.... Vote dilution in this sense can exist not withstanding the relative absence of structural barriers to exercise of the electoral franchise.

*Gingles*, 590 F.Supp. at 355.

Under this line of reasoning, vote dilution may result "from the submergence in one multi-member district of black voter concentrations sufficient, if not 'fractured' or 'submerged,' to constitute an effective single-member district voting majority." *Id.*

Finally, as the *Gingles* trial court observed, Congress, in enacting amended Section 2,

made a deliberate political judgment that the time had come to apply the statute's remedial measures to *present conditions* of racial vote dilution....

In making that political judgment, Congress necessarily took into account and rejected as unfounded, or assumed as outweighed, several risks to fundamental political values that opponents of the amendment urged in committee deliberations and floor debate. Among these were the risk that the judicial remedy might actually be at odds with the judg-

ment of significant elements in the racial minority; the risk that creating "safe" black-majority single-member districts would perpetuate racial ghettos and racial polarization in voting behavior; the risk that reliance upon the judicial remedy would supplant the normal, more healthy processes of acquiring political power by registration, voting and coalition building; and the fundamental risk that the recognition of "group voting rights" and the imposing of affirmative obligation upon government to secure those rights by race-conscious electoral mechanisms was alien to the American political tradition.

For courts applying Section 2, the significance of Congress's general rejection or assumption of these risks as a matter of political judgment is that they are not among the circumstances to be considered in determining whether a challenged electoral mechanism presently "results" in racial vote dilution, either as a new or perpetuated condition.

*Id.* at 356–57 (emphasis in original) (footnotes omitted).

Although Congress expanded Section 2 liability by eliminating the intent requirement, it limited the circumstances under which a Section 2 violation may be proved in three ways: (1) electoral devices, such as at-large elections, are not *per se* violations of the statute; the totality of the circumstances must show unequal access to the political process; (2) allegedly dilutive mechanisms and lack of proportional representation in and of themselves do not establish a violation of Section 2; and (3) racial bloc voting will not be assumed to exist; the plaintiffs must prove it exists. *Gingles*, 106 S.Ct. at 2764.

In *Gingles*, the Supreme Court held that "[t]he essence of a Section 2 claim is that a certain electoral ... structure interacts with the social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 2764–65. The Supreme Court expressly noted that such an inequality exists when at-large voting schemes operate to cancel

out the voting strength of racial minorities. *Id.*

■ To prove that an at-large system cancels out the voting strength of a racial minority, the minority must establish the existence of three conditions: (1) that it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that it is politically cohesive; and (3) that the white majority voting bloc usually defeats the minority's preferred candidate. *Id.* at 2766–67.

Without establishing the first condition, the minority group cannot show that it has even the potential to elect the candidate of its choice in the absence of the alleged discriminatory practice. *Id.* at 2766, n. 17. The final two requirements comprise the foundation for a finding that racial vote polarization exists. Establishment of these two conditions demonstrates that the black minority usually votes for one candidate, and the white majority votes for *and elects* a different candidate. If this racial vote polarization exists, then the minority voters have shown that "submergence in a white multi-member district impedes its ability to elect its chosen representatives." *Id.* at 2767.

It is important to remember that the term racially polarized voting merely "refers to the situation where different races vote in blocs for different candidates." *Id.* at 2773. The Supreme Court stressed that "[r]acially polarized voting refers only to the existence of a correlation between the race of voters and the selection of certain candidates.... Defendants may not rebut that case with evidence of causation [e.g., multivariate analysis] or intent." *Id.* at 2779.

### III. FINDINGS OF FACT[1]

### A. THE NATURE AND HISTORY OF THE GOVERNMENT OF THE CITY OF SPRINGFIELD

1. The City of Springfield is a municipality as that term is defined by the Illinois Constitution of 1970, Article VII, § 1, and the Illinois Municipal Code, Ill.Rev.Stat. ch. 24, ¶ 1-1-2 (1985). It is also a home rule unit as defined by the Illinois Constitution of 1970, Article VII, § 6(a).

2. The City of Springfield utilizes the commission form of government, as that system is defined in Ill.Rev.Stat. ch. 24, Article 4 (1985).

3. Springfield was incorporated, first as a town in 1832, and then as a city in 1840.

4. In 1854, a consolidated charter provided for a mayor/aldermanic form of government, with the aldermen elected from wards within the city. This form of government continued until 1911. In 1911, the city's government provided for 14 aldermen, two each elected from seven wards.

5. In 1911, Springfield adopted the commission form of government by referendum, and that form of government continues to the present day.

6. Under the commission form of government, Springfield is governed by a five-member city council consisting of a mayor and four commissioners, elected at-large, with each council member also serving in an executive capacity as the head of one of the five executive departments of city government.

7. The executive offices of the commissioners are as follows: Commissioner of Accounts and Finances, Commissioner of Public Health and Safety, Commissioner of Streets and Public Improvements, and Commissioner of Public Property. The mayor serves as the Commissioner of Public Affairs.

8. Prior to 1966, except for the mayor, the commissioners were not elected to a particular executive department; the executive departments were assigned at the first city council meeting after the election of commissioners, as then provided in Ill. Rev.Stat. ch. 24, ¶ 4-5-3 (1965).

9. Pursuant to Ill.Rev.Stat. ch. 24, ¶ 4-3-19 (1965), which was added to the Municipal Code in 1965, a referendum was

---

1. Many of the findings of fact are taken from the agreed statements of fact contained in the pretrial order.

approved in 1966, requiring each candidate for commissioner to run for a specific executive office.

10. The forms of municipal government available in Illinois by statute are:

a. *Commission Form:*

The current form of government is established pursuant to Article 4 of the Illinois Municipal Code. Section 4–3–2 requires that there shall be a mayor and four commissioners elected at-large and expressly prohibits the division of the city into wards.

b. *Mayor-Aldermanic:*

Under Sections 3–4–7 and 3–4–9 of the Illinois Municipal Code, a mayor/aldermanic system has a number of aldermen set by an arithmetic formula derived from the city's population. For a city the size of Springfield, there would be 10 wards with either 10 or 20 aldermen.

c. *Strong Mayor-Aldermanic:*

For purposes of districting in a strong mayor/aldermanic system, Section 6–3–3 of the Municipal Code provides for 20 aldermen for a city the size of Springfield with two aldermen representing each ward. Section 6–3–5 requires that the city be districted with one-half as many wards as the total number of aldermen to which the city is entitled.

d. *Council-Manager:*

Under Sections 5–2–2 and 5–2–4, the council-manager system would have the same districting requirement as the mayor-aldermanic system, resulting in the division of Springfield into ten wards with one or two aldermen per ward. Under Section 5–2–12, however, the aldermen can be elected at-large, and a city the size of Springfield would have eight aldermen.

e. *Home Rule:*

Pursuant to the City's home rule power, the City, with voter approval, may vary from the statutory forms of government and their requirements as to council size.

11. Under the commission form, candidates for mayor and for commissioner are nominated from the municipality at-large in a non-partisan primary election, as provid-ed in Ill.Rev.Stat. ch. 24, ¶¶ 4–3–2, 4–3–5, 4–3–10, and 4–3–10.1 (1985).

12. Under the commission form of government there are no requirements or limitations on the residences of the mayor and the commissioners; each may reside anywhere within the city limits.

13. Pursuant to Ill.Rev.Stat. ch. 24, ¶ 4–3–13 (1985), only the names of the two candidates receiving the highest number of votes for mayor in the primary election are placed on the ballot for mayor at the general election; only the names of the two candidates with the highest number of votes in the primary election for each of the commissioner offices are placed on the ballot for each office in the general election.

14. Neither the Illinois Municipal Code nor the Illinois Election Code contains any majority vote requirement for the election of mayor or commissioner in a general election. The Illinois Election Code allows the use of write-in votes for candidates whose names do not appear upon the ballot. Ill.Rev.Stat. ch. 46, ¶¶ 16–3 and 18–9.1 (1985).

15. Single-shot voting, as that term is defined in *Thornburg v. Gingles,* —— U.S. ——, 106 S.Ct. 2752, 2760, n. 5, 92 L.Ed.2d 25 (1986), for commissioners is precluded by the requirement that each commissioner run for a specific office.

## B. ELECTION RESULTS AND POLITICAL PARTY LEADERSHIP

1. No black has been elected to the Springfield City Council since 1911.

2. In the 1963 primary election for City Council in Springfield, Illinois, there were 28 candidates. Nick Renfrow, a black candidate, finished 21st out of 28 candidates. The parties are not aware of any other black candidate who has run for election to the City Council of the City of Springfield from 1963 until 1971.

3. In the February, 1971, primary for Commissioner of Accounts and Finance, conducted at-large, the vote totals and race of the candidates were as follows: (1)

James Dunham, white, 15,962 votes; (2) Gary Tumulty, white, 5,851 votes; (3) N.F.N. Evans, white, 3,728 votes; (4) Charles Nelson, black, 1,807 votes.

4. In the February, 1971, primary for mayor, the vote totals and race of the candidates were as follows: (1) William Telford, white, 11,988 votes; (2) Denney Kelley, white, 6,704 votes; (3) James Henneberry, white, 4,983 votes; (4) Farries Morrison, black, 2,063 votes; (5) Fritz O'Hara, white, 1,215 votes; (6) Skip Dunkirk, white, 501 votes.

5. In the February, 1983, primary for mayor, the vote total and the race of the candidates were as follows: (1) J. Michael Houston, white, 12,760 votes; (2) James Dunham, white, 7,565 votes; (3) James Bolt, white, 2,949 votes; (4) Ida Jackson, black, 1,945 votes; (5) Virgil Gochanour, white, 184 votes.

6. In the April, 1985, special general election for Commissioner of Accounts and Finances, James Norris, a white, defeated Willis Logan, a black. No primary was necessary; Logan and Norris were the only two candidates.

7. In 1982, Carol Dew, a black woman, was the Republican candidate for Sangamon County Clerk. She unsuccessfully opposed Gary Tumulty, a white man.

8. There were no black officers of either the Democratic or Republican County Central Committee for Sangamon County prior to 1984.

9. The current officers of the Democratic County Central Committee for Sangamon County and their race are as follows:

Chairman—Peter Dixon, white

Secretary—Genevieve Giganti, white

Treasurer—Nick Bussone, white

10. The current officers of the Republican County Central Committee for Sangamon County and their race are as follows:

Chairman—Irv Smith, white

Secretary—Bruce Stratton, white

Treasurer—William Cellini, white

11. Blacks now and prior to 1984 have been presidents of the Republican clubs and Republican district chairmen, and in those capacities have sat on the party's executive committee which is the governing arm of the Republican Central Committee.

Blacks now and prior to 1984 have been presidents of Democratic clubs and vice-chairmen of clubs and in those capacities have sat on the party's executive committee which is the governing arm of the Democratic Central Committee.

In 1984 a black was elected secretary of the Democratic County Central Committee of Sangamon County.

## C. BLACK DEMOGRAPHICS

1. Data on the population and racial composition of Springfield are contained in the 1980 Census of the U.S. Bureau of the Census and the 1980 Census Analysis by the Springfield-Sangamon County Regional Planning Commission. Advance counts indicated a population of 99,637. Based upon corrections, the official count indicates a population of 100,054. Based upon the 1980 Census Analysis, which used the advance counts, in 1980 there were 10,755 blacks residing in Springfield comprising 10.8% of the population.

2. According to the 1980 census data, 8.54% of the 18 years of age and older population of Springfield is black.

3. According to the 1980 Census estimate, the percentage of black residents of Springfield, 18 years of age and older, is 59% of the total black population.

4. In 1970 in Springfield there were 841 blacks living outside of census tracts 8, 15, 16, 17, and 24 and 6,672 blacks living inside those census tracts.

5. According to the 1980 Census data, 73.4% of blacks residing in Springfield reside in tract Numbers 8, 15, 16, 17, and 24, which are contiguous tracts concentrated east of 9th Street.

6. In 1980 in Springfield there were 2,858 blacks living outside census tracts 8, 15, 16, 17, and 24, and 7,897 blacks living inside those census tracts.

7. The number of blacks living in Springfield outside census tracts 8, 15, 16,

17, and 24 increased from 1970 to 1980 by 239.83%.

8. The percentage of blacks living in Springfield inside census tracts 8, 15, 16, 17, and 24 decreased from 1970 to 1980 from 88.8% to 73.4%.

9. Between 1970 and 1980 the number of blacks living in Springfield in census tracts 8, 15, 16, 17, and 24 increased 1,225 while the number of blacks living in Springfield outside those census tracts increased 2,017. Consequently, between 1970 and 1980, for every additional black living in Springfield inside census tracts 8, 15, 16, 17, and 24, there was an increase of 1.64 blacks living in Springfield outside those census tracts, and the black population in Springfield grew at a faster rate outside those census tracts than inside.

10. According to the precinct data compiled by the Springfield-Sangamon County Regional Planning Commission, all current members of the Springfield City Council reside in precincts which are more than 95% white.

11. All current members of the Springfield City Council reside west of Pasfield Street, which is 11 blocks west of 9th Street in Springfield, Illinois.

12. The east neighborhood census tract populations, however, are not purely black but are integrated. Many of the election precincts within Springfied's east neighborhood are 60% black and 40% white. There are some precincts which have as high as 90% black inhabitants, but those precincts are very few in number.

13. The census data shows that the blacks in Springfield constitute a distinct population, and that it is congregated in a specific geographic area.

14. If the City of Springfield were divided into 10 wards, at least one ward could have a majority black population.

15. If the City of Springfield were divided into four or five wards, no ward would have a majority black population.

16. Douglas N. Kane, who was called as a witness on electoral demographics by the plaintiffs, is currently the Deputy Auditor General of the State of Illinois. He has a Ph.D. in economics from the University of Illinois with areas of concentration in public finance and regional economics. His minor emphasis was in political science.

17. Kane has extensive background and experience as a political worker in the Springfield area. He has been a member of the Illinois General Assembly between 1974 and 1982. He was elected to four terms but did not seek reelection in 1982. He has also worked in the executive branch of Illinois government.

18. Kane has managed twelve political campaigns in Sangamon County. He is familiar with the candidate election procedures in the City of Springfield, and has studied Springfield election returns, including the racial composition of the Springfield precincts.

19. He worked with the Democratic leadership in the Illinois House of Representatives in making the redistricting plan for Illinois in 1971 and is experienced in the subject of redistricting. Kane prepared what was received in evidence as Plaintiffs' Exhibit 47–2, a map redistricting Springfield into 10 city council electoral districts under the Illinois mayor/aldermanic form of government.

20. In drawing the 10 proposed districts for the City of Springfield, Kane took into consideration the racial composition of the 10 proposed districts shown in Exhibit 47–2 and drew Ward No. 6, which is shown in red on the exhibit, so that it contained 59.5% black population. Proposed Ward 6 roughly coincides with Sangamon County Board Districts 18, 19, and 20, which currently are represented by black County Board members.

21. Kane drew the proposed 10 districts so that they would have equal population with a maximum deviation of 5% and maintained neighborhoods and existing political precincts. He stated, and he is not challenged by the defendants, that Exhibit 47–2 comports with all court decisions based on the one-person, one-vote concept.

22. Given a ward containing 59.5% black population, the minority group demonstrates that it is sufficiently large and

geographically compact to possess the potential to elect representatives of its choice in the absence of the challenged structure or practice.

## D. PAST DISCRIMINATION

1. In 1908 in the City of Springfield, there was a race riot in which people were killed and injured, and businesses and homes were vandalized.

2. The 1892 and 1921 Codes of the City of Springfield provided for the Board of Managers of the city-owned Oakridge Cemetery to:

> ... set aside a portion of the cemetery grounds for the burial of the poor, another portion for the burial of strangers or persons not belonging to the city ... and another portion for the burial of colored persons.

Since 1953, the City Code has not contained such a provision.

3. No black was appointed to the cemetery board until Dr. D.E. Webster was appointed in the 1950's by Mayor Nelson Howarth.

4. Until at least the 1940's, blacks were segregated in some Springfield movie theaters by being required to sit in designated seating in the balconies.

5. Until 1952, the City of Springfield maintained an official policy of racial segregation for the patrons of the city-operated beaches at city-owned Lake Springfield. The beach at Center Park was restricted to white persons; Bridgeview Beach was operated for black persons.

6. Prior to 1956, the Municipal Band Commission of the City of Springfield consisted of two units, one of which was white and one of which was black in membership.

7. Until 1956, the Springfield Fire Department maintained a segregated engine house, No. 5, to which all black firemen were assigned.

8. In 1966, the then Mayor ordered the cessation of the policy of teaming black police officers only with other black officers.

9. In 1974, Springfield School District No. 186 entered into a consent decree as a result of school desegregation litigation and must file annual reports with the U.S. District Court for the Central District of Illinois, Springfield Division, in compliance with the order approving the decree.

10. In 1974, the Palmer Elementary School, located in Census Tract 8, was closed. Census Tract 8 had a 48.2% black population as shown in the 1980 Census.

11. In 1984, Tracey Meares, a black, was recognized as the top student in order of class rank by Springfield High School in its Summer Newsletter and was honored by being selected to give the Invocation at the School's graduation ceremony.

12. There are two American Legion Posts in Springfield which operate independently of each other, including marching as separate units in parades.

## E. HOUSING

1. Springfield has had a fair housing ordinance since 1966.

2. In 1968, the League of Women Voters of Springfield concluded that a clause in the leases used by the City for its Lake Springfield property which required consent of neighboring custodians to transfer of a lease was subject to discriminatory misuse, and therefore recommended its deletion. In 1969 the City deleted the clause objected to by the League.

3. In 1969, the League of Women Voters of Springfield reported that it had recommended in 1968 that the Springfield Housing Ordinance be strengthened in three aspects. It further reported that the Ordinance was amended by the City Council in 1968 to include all three points recommended.

4. In February of 1981, the City Council approved the execution of a Memorandum of Understanding between the City and the U.S. Department of Housing and Urban Development. The purpose of the Memorandum was to authorize participation in the locally developed New Horizons Fair Housing Assistance Project. That project involved the establishment of a task force to assess the housing patterns in the City

and develop a fair housing strategy and action plan that had as its purpose fostering and promoting equal housing opportunity.

5. The City of Springfield and the U.S. Department of Housing and Urban Development entered into a Memorandum of Understanding dated 5/26/82 by the City and 6/17/82 and 11/5/82 by H.U.D. The purpose of the understanding was to provide for cooperation and coordination of handling housing discrimination complaints under Title VIII of the Civil Rights Act of 1968, as amended, and the City's Fair Housing Ordinance.

6. Since 1982, the Springfield Fair Housing Board has received from the U.S. Department of Housing and Urban Development five Fair Housing Assistance Grants totaling $151,200.

7. The City of Springfield allocated $1,168 from its corporate funds for the Fair Housing Board budget for fiscal year 1984–85.

8. The City of Springfield allocated $1,168 from its corporate funds for the Fair Housing Board project for fiscal year 1985–86.

9. Between May, 1974, and December, 1985, the City of Springfield approved the issuance of Industrial Revenue Bonds (IRB) 32 times for a total approval of $89,388,000.

10. Of the 32 IRB projects approved between May, 1974, and December, 1985, one was located within the five census tracts containing 73.4% of the black population of Springfield. One project was adjacent to the five tracts.

11. Ninety-one percent of the $89,388,000 approved for revenue bonds since May, 1974, went for projects outside the five census tracts containing 73.4% of the black population of Springfield.

12. The two most recent letters of intent issued by the City for issuance of IRB are for sheltered-care projects to be developed on vacant land west of Chatham Road.

### F. MINORITY EMPLOYMENT

1. The February 1979 report entitled "The State of Black Springfield" compiled by the Springfield Urban League, Inc., stated that minorities make up 9.3% of the City's work force. This percentage was higher than the percentage of the Sangamon County labor force which was black.

2. In the City's EEO City-Wide Utilization Analysis dated 2/21/86, the City's percentage of employees who are black exceeded the percentage of blacks in the Sangamon County labor force in five of the seven EEO job groups.

3. In 1971, the City created a full-time city legal department. Since that time, no black attorneys have been employed. One person has been employed for one out of six support positions.

4. The City's Legal Department employed a black legal secretary in 1982 and 1983 who then left to become the administrative secretary to the Commissioner of Accounts and Finance.

5. The City of Springfield did not have an official affirmative action plan prior to 1981.

6. The Springfield Fire Department presently employs eight black firemen out of 183 firemen.

7. The Springfield Clinic, a private association of physicians, employs no black physicians.

### G. HEALTH, EDUCATION, AND LIVING STANDARDS

1. The only public health facility owned or operated by the City is located in census tract 15.

2. The State of Illinois does not require health departments at the municipal or county level to aggregate disease information by race.

3. The Illinois Department of Public Health figures on infant mortality referred to by Plaintiffs in Plaintiffs' Exhibit 16 do not distinguish between accidental deaths and deaths due to natural causes.

4. U.S. Bureau of Census publications indicate that between 1970 and 1980, the

percentage of high school graduates in the black population in Springfield increased 45.4% while the percentage of high school graduates in the black population in Illinois increased 42.9%. A subtraction shows that the Springfield increase was 2.5 percentage points more than the Illinois increase.

5. U.S. Bureau of the Census publications indicate that between 1970 and 1980, the median family income in the black population in Springfield increased 87.6% while the percentage in the black population in Illinois increased 85.7%. Subtraction shows that the Springfield increase was 1.9 percentage points more than the Illinois increase.

6. U.S. Bureau of the Census publications indicate that between 1970 and 1980, the *per capita* personal income for the black population in Springfield increased 131.8% while the percentage in the black population in Illinois increased 120.6%. Subtraction shows that the Springfield increase was 11.2 percentage points more than the Illinois increase.

7. U.S. Bureau of the Census publications indicate that between 1970 and 1980, the percentage of families below the poverty level in the black population in Springfield increased 16.9% while the percentage in the black population in Illinois increased 53.1%. Subtraction shows that the Illinois increase was 36.2 percentage points more than the Springfield increase.

8. U.S. Bureau of the Census publications indicate that between 1970 and 1980, the median value of owner-occupied dwelling units in the black population in Springfield increased 188.3% while the percentage in the black population in Illinois increased 105.3%. Subtraction shows that the Springfield increase was 83 percentage points more than the Illinois increase.

### H. COMMUNITY SERVICES

1. The Springfield public library, which is operated by the City, has never maintained more than four branch library facilities at any given time.

2. From January 10, 1927, with the exception of a period of time totalling less than one year, there has been at least one library branch maintained east of 9th Street.

3. From July 28, 1968, to September of 1983, there were two library branches maintained east of 9th Street.

4. There is a library branch currently maintained in one of the five census tracts which combined contain 73.4% of the blacks residing in Springfield.

5. The library branches referred to above were either located in, or one block from, one of the five census tracts which combined contain 73.4% of the blacks residing in Springfield.

6. Since at least 1974, the Springfield public library has recognized a black history week or month by sponsoring various events at the library relating to black history and culture.

7. Of the 31 census tracts in which Springfield is located, 3 of the 5 census tracts which combined contain 73.4% of the blacks residing in Springfield have a park owned by a government body, while 16 of the remaining 26 census tracts have such a park. The percentage of the black census tracts having a park is 60% while the percentage of the remaining census tracts having a park is 61.5%.

8. The only facility owned by the City which contains an indoor gymnasium is located in one of the five census tracts which combined contain 73.4% of the blacks living in Springfield.

9. There are three public swimming pools within the City of Springfield. Two of those pools are owned by the Springfield Park District. The third pool is owned by the City of Springfield. The pool owned by the City of Springfield and one of the pools owned by the park district are located within the five census tracts which contain 73.4% of the black population of Springfield. The pool owned by the City was operated jointly by the City and the school district until 1981 when the school district ceased participating. Thereafter, the City operated the pool alone until 1986 when the pool was closed.

## I. HISTORY OF OFFICIAL DISCRIMINATION IN VOTING

1. Illinois has no history of poll taxes or literacy tests which were used to prevent citizens from registering to vote or from voting.

2. The physical acts of registering and voting are in no way hampered or discouraged in Springfield by official governmental action. To the contrary, under recent amendments to the Illinois Registration and Voters Act, registration is encouraged and facilitated by the Springfield Election Commission and registration places and registrars are numerous and readily available.

3. Between 1968 and 1984, the Springfield Board of Election Commissioners has conducted voter registration at least every other year at locations within at least one of the following census tracts: 8, 15, 16, 17, and 24.

4. Two possible forms of official discrimination in voting exist in Springfield under the Commission form of government. They are: (1) the absence of any cumulative voting rights (no bullet voting) because of the designated seat plan adopted in 1966, i.e., each commission candidate must run for a designated seat; (2) the requirement that, after the non-partisan primary, the two top vote-getters for each office in the primary run against each other in the general election. There is no official majority vote requirement in Illinois, but requiring the two candidates who attain the most votes in the non-partisan primary to run against each other in the general election has the same effect.[2]

## J. EFFECTS OF PAST SEGREGATION AND DISCRIMINATION ON VOTING ABILITY

1. The effects of past racial discrimination in fields such as education, employment, housing, and health are recognized as lessening the ability of a minority to vote effectively for candidates of its choice.

The evidence in the case shows that the City of Springfield, while it had no Jim Crow laws, nonetheless, like many similar northern cities, was a segregated and racially isolated community until about twenty-five years ago.

2. The testimony of the lay witnesses and the testimony of expert witnesses Dr. Lawrence C. Golden and Dr. Chandler Davidson, all of which the court credits, are that until perhaps the past twenty-five years Springfield was a segregated city with the blacks racially isolated in the eastern part of the City.

3. The 1908 race riot is probably the historical landmark marking the beginning of the segregation and racial isolation of the minority blacks.

4. In 1911, Springfield adopted the commission form of government with at-large elections and abandoned the mayor/aldermanic form of government with aldermen elected by wards.

5. Housing was segregated; education was segregated; blacks were limited in employment opportunities to service or labor occupations.

6. Commencing in the late fifties and early sixties with the United States Supreme Court decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and the Civil Rights Acts of 1964, Springfield began to emerge from being a racially segregated city.

7. Today, Springfield is more integrated in its housing and in its education than it was a generation ago. Blacks enjoy greater socioeconomic success than they did prior to the early 1960's, but the effects of the past discriminations and disadvantages are still felt.

8. The blacks in Springfield, the evidence shows and the court finds, still are the lowest socioeconomic group in the community. Their housing is still the poorest quality of the housing in the community,

---

**2.** *Gingles*, 590 F.Supp. at 360, recognized that both of these governmentally employed devices

dilute the black minority vote and submerge it in the white minority vote.

and they continue to suffer health deficiencies beyond that of the white community.[3]

9. The Springfield death rate of black infants exceeds that of black infants in Chicago and that of white infants in Springfield. The Springfield Director of Health DeKroger is at a loss to explain the higher black infant mortality rate in Springfield.

10. These disparities exist notwithstanding the progress Springfield has made in the last twenty years toward a more open and equal opportunity society for its black minority.

11. While Dr. MacManus, the social science expert called by the defendants, believes that blacks and whites in the same socioeconomic status tend to vote in similar numbers, she admitted on cross-examination that the leading socioeconomic indicators show a growing disparity between blacks and whites in Springfield between 1970 and 1980.

12. The lingering effects of segregation and racial isolation are seen in the statistics of black turnout at the polls. The voting participation of blacks continues to lag well behind that of whites.[4] Blacks participate at a rate of one-third to one-half of white voters. Dr. MacManus agreed on cross-examination that such was the case.

### K. RACIALLY POLARIZED VOTING

1. The testimony of the witnesses overwhelmingly supports the finding that extreme racially polarized voting exists in Springfield, Illinois. The lay witnesses, Frank W. McNeil, Rudolph V. Davenport,

Kenneth Barton, Dr. Douglas Kane, Dr. Edwin A. Lee, Sr., and the expert witnesses, Dr. Race Davies, Dr. Chandler Davidson, Dr. Charles Bullock, and Dr. Allen Lichtman, agreed on that point. If the definition of racially polarized voting set out in *Thornburg v. Gingles* is applied to Springfield election results, extreme racially polarized voting exists in Springfield, Illinois.

2. Dr. Kane testified, and the court finds, that the blacks within the proposed Ward 6 vote cohesively.

3. Using proposed Ward 6 as a model, Kane analyzed city-wide elections since 1979 to determine the ability of blacks to elect black candidates to the SMEAA Board, Park Board, the School Board, and to the city council as commissioners and mayor. In the contests he analyzed, Kane found that only one out of eight black candidates won in city-wide election, but if you counted only the votes in proposed Ward 6, eight out of the eight black candidates would have won.

4. In the 15 races he analyzed where blacks had run as candidates, Kane found that two out of fifteen black candidates had won city-wide contests. In proposed Ward 6, Kane found that fourteen of the fifteen blacks would have been successful.

5. Kane used simple arithmetic demonstrations to show who voted for whom and where in past elections.[5]

6. I find the testimony of the witness Dr. Race Davies to be credible. He withstood two days of vigorous cross-examina-

---

**3.** *See* Defendants' Exhibit 98–1 attached as Appendix A.

**4.** The participation level of Springfield blacks in elections is shown in Defendants' Exhibit 320–16, prepared Dr. Charles Bullock. It is attached as Appendix B.

**5.** Kane also made an attempt to draw five districts in the east side of Springfield. The court has not considered this evidence because the court deems it irrelevant. The defendants, in their motion for summary judgment earlier in the case, argued that the plaintiffs could not meet the threshold requirement of an elective majority in a single-district if the city was divided into 5 districts. The court has answered this argument and ruled on it in the order denying the motion for summary judgment. However,

it seems appropriate to observe once again that there is no Illinois statutory basis for a five-member city council elected by district. The defendants' suggestion that the home rule powers of the Illinois Constitution might permit them to establish such a government is hypothetical and speculative at best. At worst, it suggests the possibility of a deliberate intention to dilute black voting strength. The black minority population living on the east side of Springfield contained in proposed Ward 6, as shown in Plaintiffs' Exhibit 47–2, is politically cohesive. The evidence dealing with racially polarized voting shows that the blacks in the proposed Ward 6, given the opportunity, will vote for a black candidate.

tion of his opinions and of his work and analysis of the electoral demographics in Springfield, Illinois. In addition, his opinion that racially polarized voting existed in Springfield, Illinois, was reviewed and corroborated by such nationally recognized authorities on the subject as Dr. Chandler Davidson of Rice University and Dr. Allen Lichtman of American University.

7. In addition, the defendants' expert witness on racially polarized voting, Dr. Charles Bullock of the University of Georgia, derived regression estimates that showed more extreme racial polarization than the estimates derived by Dr. Davies. Dr. Bullock agreed that if the *Thornburg v. Gingles* definition of racially polarized voting was applied to either his work or Dr. Davies' work, it would show that extreme racially polarized voting existed in Springfield, Illinois.[6]

8. Dr. Davies concluded in his report, and the court finds, that:

Over the past 16 years, black voters have strongly favored black candidates when the opportunity arose, while most white voters have persistently opposed them. In a city with an at-large election system where white residents outnumber blacks nearly nine to one, such racial bloc voting would preclude a black from being elected to the City Commission.

This extended analysis of voting in local elections in Springfield demonstrates that in races where there is a black candidate, most blacks vote for the black. White voters overwhelmingly prefer white candidates under the same circumstances. This is racially polarized voting.

Plaintiffs' Exhibit 32, p. 9.

9. Dr. Davies validated his conclusions and observations through the recognized procedures of ecological regression analysis and homogeneous case analysis.

10. Dr. Allan J. Lichtman, a nationally recognized expert in the use of ecological regression analysis, reviewed Davies' work and pronounced it sound and validly based.

11. In summarizing the results of his regression analysis, Dr. Davies said, and the court finds:

The results indicate racial polarization in each election, as a greater proportion of black than of white voters favored the black candidate. In every election but the most recent one, a substantial majority of blacks favored the black candidate whereas a substantial majority of whites opposed the black candidate.

The results show a highly cohesive black electorate. In four of the elections no blacks voted for the white candidate, and in four others the white candidates were rejected by 60 to 93% of the black voters. In not one of the contests did blacks favor election of a white candidate. For all nine contests, a mean of 85% of black voters voted for the black candidate.

The results reveal a white electorate that was consistently opposed to black candidates. In one election white support for a black candidate was almost as high as support by blacks, but in the eight other contests, between 57 and 98 percent of the white voters favored a white candidate. For all nine contests, the average level of support for black candidates by white voters was 24 percent, whereas an average of only 14 percent of blacks favored white candidates.

Plaintiffs' Exhibit 32, pp. 4, 5.

12. The Davies' homogeneous case analysis, or as he referred to it the "divergent case analysis," analyzed the vote for black candidates in precincts that were mostly black, that is, 65% or more black and precincts that were overwhelming white, that is, precincts that were 99.5% or more white. That method of study was reviewed by Dr. Chandler Davidson who is recognized as the originator of the homogeneous case analysis. Dr. Davidson found Dr. Davies' approach sound and acceptable.

13. Dr. Davies further concluded, and the court finds, that "voting statistics from all precincts in the City of Springfield and from selected precincts that are predomi-

---

**6.** Compare Davies' estimates in Table 2 Plaintiffs' Exhibit 32 with Bullock's similar estimates from Defendants' Exhibit 320. Appendix C shows the comparison.

nantly black or overwhelmingly white confirm the existence of marked degrees of racial polarization in Springfield's local elections."

14. In reviewing the contrast between the black and white precincts, Dr. Davies said, and the court finds:

The contrast between mostly black and almost entirely white precincts is stark. Voters in precincts that were 99.5% or more white voted for the black candidate only 27 of 398 times. Twenty-two of those times were in elections held after the filing of the voting rights lawsuit, and 20 of those 22 were in two races which blacks had been appointed to positions to which they were subsequently elected. However, even if the three elections conducted after the filing of the suit are included in Table 5, the racial bloc voting represented is so strong that the relationship indicated between race and voting could occur by chance less than once in 10,000 times.

Plaintiffs' Exhibit 32, p. 8.

15. Dr. Charles Bullock was not a credible witness. The court rejects Dr. Bullock's opinion that racially polarized voting exists only where ninety percent or more of a population votes consistently for candidates of a particular race. No writings in the social science literature support Dr. Bullock's opinion other than an article authored by himself. Dr. Bullock admitted on cross-examination that his methodologies in this case were "something which you wouldn't find much of in the social science literature." Dr. Bullock also candidly admitted on cross-examination that his definition of racially polarized voting is contradicted by *Thornburg v. Gingles,* —— U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Dr. Bullock's opinions were also rejected by the three-judge district court in *Edmisten v. Gingles,* 590 F.Supp. 345 (E.D. N.C.1984).

16. Dr. Bullock has been criticized by Dr. Bernard Grofman for manipulating his

statistics to mislead courts. In the UCLA Law Review, 33 UCLA L.Rev. 1, 141–142 n. 272, Dr. Bernard Grofman writes "[A] Federal Court was misled by multivariate analysis ... used by the expert witness" and "was bamboozled by misleading fantasy statistics." On cross-examination Dr. Bullock acknowledged that Dr. Grofman was referring to Bullock's work.

In this case Dr. Bullock studied only white precincts and based his regression analysis on election contests where only whites were candidates. He agrees that Table 5 in his report,[7] Defendants' Exhibit 320, purporting to show that black voters usually support winning candidates in Springfield elections, is an approach to racially polarized voting that is not recognized in social science methodology. In an attempt to support his opinion, Dr. Bullock tried to develop a multivariate model of the share of the vote received by black candidates in partisan general elections. *See* Table 11, 12, and 13 in Defendants' Exhibit 320. He abandoned the effort and withdrew that portion of his report after conferring with Dr. Jerome Sacks, Chairman of the University of Illinois Department of Statistics. Dr. Sacks told Dr. Bullock that the multivariate model was not valid since there was no way to disentangle the variables to obtain a reliable estimate.

17. After considering Dr. Bullock's report and his history of participation in voting rights cases, and having watched and listened to him testify, the court finds that his testimony was disingenuous.

18. The court finds that the same may be said about the testimony of Dr. Susan MacManus, Dr. Bullock's colleague. Her opinions of significant concentrations of black population, political participation by blacks, black educational levels, and effects of low socioeconomic status on voting did not withstand cross-examination and cannot be believed.[8] The factors upon which she based her opinions are irrelevant to a

---

7. Table 5 is an extrapolation of Table 6.

8. For a similar criticism of Dr. MacManus in another vote dilution case see *City of Port Ar-*

*thur, Texas v. United States,* 517 F.Supp. 987, 1007 n. 136 (D.D.C.1981) (three-judge panel).

"results" test in a vote dilution case. *Gingles*, 106 S.Ct. at 2773–2775.

19. Dr. MacManus gave her opinion that a single-member district plan would dilute the vote of blacks living outside Springfield's east neighborhood. This was a factor considered and dismissed by Congress in amending Section 2. *Gingles*, 590 F.Supp. at 356–57. From a procedural perspective, the plaintiff class, including those not living in the east side, must be assumed to represent the interests of all black voters in Springfield. *Id.* at 375, n. 33.

20. The defendants unsuccessfully argue that it is incorrect to focus on the relatively few races involving a black candidate versus a white candidate. "The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances." *Gingles*, 106 S.Ct. at 2770, n. 25. *See also Id.*, at 2775–76. The evidence shows that black voters in Springfield choose to sponsor black candidates, given the opportunity. "Where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim." *Id.*, at 2770, n. 25.

## L. LARGE ELECTION DISTRICTS

1. The third factor mentioned in the Senate Report "the extent to which the … political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, … that may enhance the opportunity for discrimination against the minority group;" is present in Springfield. S.Rep. No. 417, pp. 206–07. The City of Springfield has employed the largest possible election district, the whole city. As observed by the witnesses, the larger the election district the more difficult it is for minority candidates who have small budgets and limited resources to mount an effective campaign. While there is no majority vote requirement *per se*, the effect of the non-partisan primary which requires the two top vote getters to run against each other in a general election has the same effect as a majority vote requirement.

2. The procedure of requiring candidates to run for designated posts has the effect of an anti-single shot provision, since the minority voters are not able to cumulate their votes.

## M. CANDIDATE SLATING AND ACCESS OF THE MINORITY TO THE PROCESS

1. The evidence in the case shows that while there is no official, overt slating of candidates by the political parties, slating does in fact take place in a subtle and covert way. Congressman Richard Durbin testified that in 1979 there had been speculation about him running for mayor of Springfield and mention of that was made in the press. On the Sunday following the general election in 1978, Durbin says, Todd Renfrow, the then Sangamon County Democratic Chairman, asked Durbin to come speak with him. When Durbin got to Renfrow's he found William Cellini, a prominent figure in the Sangamon County Republican Party present. Cellini and Renfrow asked Durbin if he would run for mayor. All they wanted in return was for Durbin to work with both political parties on appointments such as the Airport Authority and that Durbin would agree to consult with both parties before making his appointments. Durbin declined to run for mayor.

2. Congressman Durbin says that while the city elections in Springfield are supposed to be non-partisan, they are in fact bipartisan in nature because the political parties unofficially endorse candidates.

3. Congressman Durbin's observations are corroborated by the testimony of Thomas L. Pape, the former Chairman of the Democratic Party in Sangamon County, and by Irv Smith, the present Chairman of the Republican Party in Sangamon County. Pape says that when he ran successfully for Commissioner of Accounts and Finance, he had the backing and support of both William Cellini and Bruce Stratton, who are officers of the Sangamon County Republican Central Committee. Pape also says

that in his campaign for the City Council he had the support of precinct committeemen, both Republican and Democratic.

4. Irv Smith, the Republican County Chairman, says there is no official endorsement of candidates for city office, but he does admit that the County Chairman, Central Committee Officers, the District Chairman and Precinct Committeemen of the Republican Party support candidates unofficially. It is apparent to the court that when a County Chairman, a District Chairman, and a Precinct Committeeman support a candidate they do not abandon the party machinery which is in place or forget how to run an election.

### N. ELECTION SUCCESS OF MINORITIES

1. The information contained in Defendants' Exhibit 105 entitled Black Candidates for Public Office in Springfield beginning April, 1961, is true and correct.

2. The most salient fact about city elections in the City of Springfield is that no black has ever been elected to city office in Springfield since the inception of the commission form of government in 1911. That fact, together with the presence of racially polarized voting and unanimous agreement that Springfield has qualified black candidates, speaks out most loudly in support of a conclusion of minority vote dilution.

3. Since this suit was filed, Candice Trees, a black woman, was elected Clerk of the Circuit Court of Sangamon County in a county-wide general election in November of 1986. The result is sudden and aberrant and logically can be attributed primarily to the concern generated by this litigation within the power centers of the City of Springfield. The race was a partisan race. The Republican Central Committee slated Candice Trees for office and put the full machinery of the party organization behind her. Irv Smith, the Republican County Chairman, testified that Candice Trees raised more money than any other county candidate. That truly is remarkable since the black witnesses, like the plaintiff McNeil who are knowledgeable about city politics, say that blacks are unable to raise much campaign money. Campaign money traditionally is raised from friends and from the business community. Blacks have limited personal resources and few ties in the business community.

4. It is apparent to the court, and the court finds, that the majority citizens in power sought to evade Section 2 "by manipulating the election of a 'safe' minority candidate" to an office that has no policy-making power. *See Gingles*, 106 S.Ct. at 2779 (quoting S.Rep. No. 417, p. 29, n. 115, U.S.Code Cong. & Admin.News 1982, p. 207).

5. From at least January, 1961, to the present date, the boundaries of Capitol Township have been coterminous with the municipal corporate limits of the City of Springfield.

6. Notwithstanding the success of some black candidates in Sangamon County, the fact remains that the ecological regression estimates of Dr. Race Davies (Plaintiffs' Exhibit 32, Table 2) show that before this suit was filed 91% of blacks voted for black candidates and only 9% voted for white candidates. 78% of whites voted for white candidates, and only 22% of whites voted for black candidates.

7. The successes of Frank McNeil, Ola Bridgety and Ida Jackson in campaigns for the Sangamon County Board support the plaintiffs' claim that they could successfully elect candidates of their choice absent the at-large system. The County Board seats are in single-member districts and the three successful blacks live in districts that have substantial black populations.

8. The race between Willis Logan, a black, and James Norris, a white, in 1985 for Commissioner of Accounts and Finance, in which Norris was successful and Logan lost, shows no indication of a change in racially polarized voting. Logan received overwhelming support among the blacks in the city according to Davies' regression estimates, and Norris received overwhelming support from the white voters. Davies' estimates are confirmed by the estimates made by the defendants' expert, Charles Bullock. Willis Logan's testimony that he

could have won given thirty more days to campaign is pure speculation and is negated by the evidence of racial polarization.

### O. RACIAL CAMPAIGN APPEALS

1. The evidence does not support a finding that racial campaign appeals are prevalent in Springfield. There was one incident described in the evidence arising in the 1982 County Clerk race between Dew, a black, and Tumulty, a white. Tumulty was introduced at a luncheon meeting of the American Business Club in Springfield. A racial slur was made with reference to the candidate Dew by a person in the audience. That single occurrence cannot support a claim that political campaigns in Springfield are carried out through subtle or overt racial appeals.

### P. LACK OF RESPONSIVENESS TO THE NEEDS OF THE BLACK COMMUNITY BY THE WHITE MAJORITY

1. The defendants devoted a substantial portion of their case to presenting evidence that the city government of Springfield is responsive to the needs of the black community. Certainly in the past fifteen years and especially under the administration of Mayor Houston, progress has been made to overcome the disadvantages which affect the black community. The work of the Fair Housing Board; the attempts to renew the neighborhood on the east side through the Pioneer Park Project; and the efforts to hire more black personnel are commendable.[9]

2. Opposed to this evidence of progress, however, is the testimony of the plaintiff, Frank McNeil, a black County Board member. Mr. McNeil says that the city government is not responsive to black needs. As a County Board member McNeil has had constituents come to him with problems about housing, employment, sewers, and other city government matters. McNeil says he has not been successful in his efforts to have the city be responsive to black problems or black needs. He cites as examples the continuing problem with prostitution on the east side and the need for police patrols in Comer Cox Park. He cited

one incident of alleged police misconduct in 1983–84 in which he was unable to obtain responses from the Springfield Police Chief. He was able to deal effectively with the County Sheriff because of McNeil's membership on the County Board.

3. The evidence on the issue of responsiveness constituted the weakest part of the plaintiffs' case and the strongest part of the defendants' case. However, even if the plaintiffs had failed to make a showing of a lack of responsiveness on the part of the City of Springfield, that failure would not defeat their claim. "There is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles,* 106 S.Ct. at 2764 (quoting S.Rep. No. 417, p. 29, U.S.Code Cong. & Admin.News 1982, p. 207). The cursory treatment given the responsiveness issue by the Supreme Court in *Gingles* makes responsiveness a peripheral and not a determinative issue in a vote dilution case. Moreover, the Senate Report only lists responsiveness as an additional factor that may have some probative value. S.Rep. No. 417, p. 207.

4. In addition, it should be noted that Defendants' Exhibit 98, a comparison of socioeconomic indications between the white and black communities, shows that the disparities in incomes between whites and blacks is greater in Springfield than in the United States generally. There are a greater number of black Springfield residents below the poverty line than in the United States generally. The same exhibit shows that the percent of black family income and *per capita* income is decreasing in Springfield, and that the percent of black families below the poverty line is increasing. Those facts do not indicate a great deal of responsiveness to black needs on the part of the white majority. *See also* Cross-Examination Dr. Susan MacManus, pp. 22 *et seq.*

### Q. WHETHER THE NEED FOR THE COMMISSION FORM OF GOVERNMENT IS TENUOUS

1. There was very little evidence on this point offered in the case. The defendants

---

**9.** Much of this was accomplished with federal funding and federal encouragement.

make a fleeting reference to it in their trial brief. The only witness who testified to the point was Bruce Stratton, the Secretary of the Republican Central Committee of Sangamon County. He had two reasons for supporting the commission form of government: first, because the candidates are required to run at large and must receive 50% plus one vote in order to be elected; second, that the commission form of government centers the responsibility for performance of government functions and makes for greater responsiveness on the part of the candidate elected.

2. It is obvious that both those reasons support the existence of a violation of Section 2 of the Voting Rights Act. The fact that the candidates are required to run at-large for a designated seat, where racially polarized voting is extreme, ensures that the minority will not be elected.

3. The claim of responsiveness of the officials to the electorate is tenuous in a community where racially polarized voting exists. The responsiveness of the elected official is, of course, to the white majority that elected him and not to the black minority which is without the ability to elect candidates of their choice to seats of power.

4. The court infers that the real political reason for keeping the commission form of government centers on the 1800 jobs over which the commissioners have power of appointment.[10]

## IV. CONCLUSION

■ It is the court's conclusion from its review of the evidence that the plaintiff class constitutes a geographically compact, politically cohesive, distinct population capable of electing representatives to a municipal government from single-member districts. Viewed in their totality, the circumstances of the case show: (1) the existence of substantial racially polarized voting; (2) the lingering effects of seventy years of *de facto* segregation; (3) the relatively depressed socioeconomic status of the plaintiff class which, in part, is attributable to *de facto* segregation and racial isolation; (4) a city government structured with non-partisan primaries and runoff elections; (5) the requirement of a designated seat plan for a candidate; (6) the absence of the ability to vote cumulatively; and (7) the fact that no black has been elected to city office in Springfield for seventy-five years. All these factors lead to the conclusion that the plaintiffs are submerged as a voting minority within the City of Springfield where their voting power is diluted affording them less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. It follows that the commission form of government, with its attendant standards, practices, and procedures imposed upon the plaintiff class, results in a denial or abridgement of the plaintiffs' right to vote on account of race or color in violation of Section 2 of the Voting Rights Act of 1965, as amended.

The plaintiffs are entitled to a remedy.

IT IS ORDERED that the cause is allotted for hearing to declare a remedy on January 16, 1987, at 9:00 a.m. before the court sitting in Springfield, Illinois.

---

**10.** See the testimony of Mayor Houston that the city Civil Service Commission controls hiring and firing; but that actually the hiring is done by the departments and the Civil Service Commission gives "perfunctory" approval.

■■■■■■■■■

APPENDIX A
A COMPARISON OF SOCIOECONOMIC INDICATORS
FOR ILLINOIS AND SPRINGFIELD
1970–1980

| | 1970 | | 1980 | | % Change 70–80** | |
|---|---|---|---|---|---|---|
| SES Indicator | Black Pop. | Total Pop. | Black Pop. | Total Pop. | Black Pop. | Total Pop. |
| **EDUCATION INDICATORS** | | | | | | |
| % High School Grads. | | | | | | |
| U.S. | 31.4% | 52.3% | 51.2% | 66.5% | 63.1% | 27.2% |
| Illinois | 38.2 | 52.6 | 54.6 | 66.5 | 42.9 | 26.4 |
| SPRINGFIELD | 39.2 | 57.0 | 57.0 | 71.9 | 45.4 | 26.1 |
| **INCOME INDICATORS** | | | | | | |
| Median Family Income | | | | | | |
| U.S. | $6,067 | $9.590 | $12,598 | $19,917 | 107.6 | 107.7 |
| Illinois | 7,798 | 10,957 | 14,478 | 22,746 | 85.7 | 107.7 |
| SPRINGFIELD | 6,583 | 10,339 | 12,349 | 21,524 | 87.6 | 108.1 |
| Per Capita Personal Income | | | | | | |
| U.S. | 1,818 | 3,139 | 4,545 | 7,298 | 150.0 | 132.5 |
| Illinois | 2,243 | 3,495 | 4,948 | 8,066 | 120.6 | 130.8 |
| SPRINGFIELD | 2,024 | 3,500 | 4,692 | 8,236 | 131.8 | 135.3 |
| % Families Below Pov. Level | | | | | | |
| U.S. | 29.8 | 10.7 | 26.7 | 9.6 | –10.4 | –10.3 |
| Illinois | 21.3 | 7.7 | 32.6 | 11.0 | 53.1 | 42.9 |
| SPRINGFIELD | 24.3 | 6.9 | 28.4 | 7.6 | 16.9 | 10.1 |
| **HOUSING INDICATORS** | | | | | | |
| % Owner Occupied Dwelling Units | | | | | | |
| U.S. | 41.6 | 62.9 | 44.4 | 64.4 | 5.0 | 2.4 |
| Illinois | 29.1 | 59.4 | 35.3 | 62.6 | 21.3 | 5.4 |
| SPRINGFIELD | 47.0 | 59.2 | 35.4 | 59.9 | –24.7 | 1.2 |
| Median Value OODU | | | | | | |
| U.S. | 10,600 | 17,000 | 27,200 | 47,200 | 156.6 | 177.6 |
| Illinois | 17,000 | 19,800 | 34,900 | 52,800 | 105.3 | 166.7 |
| SPRINGFIELD | 9,400 | 15,400 | 32,000 | 44,400 | 188.3 | 240.4 |

APPENDIX B

Table 6

Black and White Voting Patterns for Successful Springfield
City Commission Candidates, 1971–1985
(Continued, pg. 2)

| | WHITES | | Partici- | % | | BLACKS | | Partici- | % | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | For | Against | pation | Support | Place | For | Against | pation | Support | Place | Cands. |
| **1979 PRIMARY** | | | | | | | | | | | |
| Mayor— | | | | | | | | | | | |
| Madonia | 12.3 | 14.8 | 27.1 | 45.4 | 1 | 6.3 | 0.9 | 7.2 | 87.5 | 1 | 5 |
| Finances— | (.05) | (.22) | | | | (.05) | (.23) | | | | |
| Pape | 13.6 | 13.7 | 27.3 | 49.8 | 2 | 6.9 | 0.4 | 7.3 | 94.5 | 1 | 2 |
| Health— | (.06) | (.19) | | | | (.06) | (.21) | | | | |
| Ward | 18.0 | 9.1 | 27.1 | 66.4 | 1 | 2.3 | 5.5 | 7.8 | 29.5 | 2 | 4 |
| Streets— | (.16) | (.03) | | | | (.16) | (.04) | | | | |

| Candidate and Office | % Blacks Voting for Black | % Blacks Voting for Whites | % Whites Voting for Black | % Whites Voting for Whites | R² Strength of Relationship | Significance of Relationship |
|---|---|---|---|---|---|---|
| Fleischli Property— | 11.1 (.01)  16.0 (.25) | 27.1  41.0 | 2  9.1 (.01) | −1.7 (.26) | 7.4  100.0 | 1  5 |
| Bonansinga | 16.0 (.19)  11.3 (.02) | 27.3  58.6 | 1  0 (.21) | 7.5 (.02) | 7.5  0 | 2  2 |
| **1979 GENERAL Mayor—** | | | | | | |
| Houston Finances— | 22.4 (.26)  18.9 (.04) | 41.3  54.2 | 1  3.0 (.27) | 11.3 (.04) | 14.3  21.0 | 2  2 |
| Pape Health— | 21.6 (0.6)  20.1 (20.6) | 41.7  51.8 | 1  12.8 (.06) | .3 (.27) | 13.1  97.7 | 1  2 |
| Ward Streets— | 30.2 (.16)  10.7 (.09) | 40.9  73.8 | 1  8.8 (.17) | 4.6 (.10) | 13.4  65.7 | 1  2 |
| Langfelder Property— | 25.4 (.27)  16.0 (.01) | 41.4  61.4 | 1  −0.3 (.29) | 13.4 (.01) | 13.7  0 | 2  2 |
| Bonansinga | 21.9 (.17)  19.4 (.09) | 41.3  53.0 | 1  4.8 (.17) | 9.2 (.10) | 14.0  34.3 | 2  2 |
| **1983 PRIMARY Mayor—** | | | | | | |
| Houston Finances— | 16.9 (.12)  13.9 (.00) | 30.8  54.9 | 1  −0.3 (.11) | 14.5 (.00) | 14.2  0 | 4  5 |
| Pape Health— | Unopposed | | 1 | | | 1  1 |
| Ward Streets— | 15.4 (.01)  15.3 (.17) | 30.7  50.2 | 1  11.7 (.01) | 1.6 (.17) | 13.3  88.0 | 1  4 |
| Langfelder Property— | 27.0 (.07)  3.9 (.01) | 30.9  87.4 | 1  10.1 (.07) | 2.9 (.01) | 13.0  77.7 | 1  3 |
| Bonansinga | 14.8 (.03)  15.9 (.09) | 30.7  48.2 | 1  7.5 (.03) | 5.6 (.09) | 13.1  57.3 | 1  4 |
| **1983 GENERAL Mayor—** | | | | | | |
| Houston Finances— | 26.6 (.07)  14.9 (.04) | 41.5  64.1 | 1  13.6 (.04) | 7.4 (.06) | 21.0  68.0 | 1  2 |
| Pape Health— | Unopposed | | 1 | | | 1  1 |
| Ward Streets— | 24.0 (.04)  17.7 (.17) | 41.7  57.6 | 1  15.1 (.02) | 5.8 (.11) | 20.9  72.2 | 1  2 |
| Langfelder Property— | 37.7 (.10)  3.8 (.01) | 41.5  90.8 | 1  18.2 (.06) | 2.1 (.02) | 20.3  89.7 | 1  2 |
| Bonansinga | 29.2 (.07)  12.1 (.06) | 41.3  70.7 | 1  14.4 (.04) | 6.4 (.06) | 20.8  69.2 | 1  2 |

APPENDIX C

TABLE 2

ECOLOGICAL REGRESSION ESTIMATES OF RACIAL POLARIZATION
IN SPRINGFIELD ELECTIONS