Paul L. **WILLIAMS**, Anthony L. Young, and Miguel Del Valle, Plaintiffs,

v.

**STATE BOARD OF ELECTIONS**, et al., Defendants.

No. 88 C 2377.

United States District Court, N.D. Illinois, E.D.

June 30, 1989.

See also 718 F.Supp. 1323.

Michael P. Seng, John Marshall Law School, Chicago, Ill., for Paul L. Williams.

James C. Craven and Donald M. Craven, James C. Craven, P.C., Springfield, Ill., for Paul L. Williams, Anthony L. Young and Miguel Del Valle.

Terry McDonald, Asst. State's Atty., Sup'r Federal Litigation Unit, Chicago, Ill., for Stanley Kusper.

Michael Levinson, Chicago Bd. of Elections, Chicago, Ill., for Chicago Bd. of Election Com'rs.

Roger P. Flahaven, Atty. Gen. of Ill., Chicago, Ill., for State Bd. of Elections, et al.

Barry T. McNamara, D'Ancona & Pflaum, Chicago, Ill., for Paddy H. McNamara.

James J. Stamos, Chicago, Ill., pro se.

Michael J. Hayes, James R. Carroll and Bart T. Murphy, Asst. Attys. Gen., Chicago, Ill., for Daniel P. Ward, Wm. G. Clark and Alan J. Greiman.

Sidney Z. Karasik, Asst. Atty. Gen., Chicago, Ill., for Daniel P. Ward and Wm. G. Clark.

Susan Getzendanner, Eileen A. Kamerick and Charles F. Smith, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., for Francis S. Lorenz.

Jerold S. Solovy, Jeffrey D. Colman, Barry Sullivan and Marshall J. Schmitt, Jenner & Block, Chicago, Ill., for Harry G. Comerford.

Dan K. Webb, Paul P. Biebel, Jr., Steven F. Molo, Jennifer G. Brown and Richard Wm. Austin, Winston & Strawn, Chicago, Ill., for Kenneth L. Gillis.

Raymond F. Simons and Joseph A. Spitalli, Simon & Spitalli, Chicago, Ill., for Roger Kiley.

Thomas R. McMillen, Evanston, Ill., for Roger S. Barrett.

## MEMORANDUM OPINION

GRADY, Chief Judge.

Defendants have moved for summary judgment on the ground that plaintiffs are unable to satisfy one of the "preconditions" established by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), for a vote dilution claim under Section 2 et seq. of the Voting Rights Act of 1965. We grant the motion.

### THE FACTS

The plaintiffs in this case are two separate classes, one consisting of all black citizens of voting age in Cook County, Illinois, and the other consisting of all Hispanic citizens of voting age in Cook County, Illinois. Plaintiffs claim that, because of certain characteristics of the electoral process in Cook County, they usually are unable to elect candidates of their choice to positions on the Circuit Court of Cook County, the Illinois Appellate Court, and the Illinois Supreme Court. The allegations of the original complaint were understood by this court to mean that, due to white bloc voting, the candidates for whom plaintiffs vote in judicial elections usually lose. That allegation was made explicit in the third amended complaint (¶ 21, p. 10). What prompts defendants' summary judgment motion is that this allegation is not true. Defendants have amply demonstrated in the materials presented in support of their motion that, instead of usually losing, the candidates for whom the class of black plaintiffs has voted in elections for the circuit and appellate courts have won more often than not. Plaintiffs have submitted no data as to the success of the candidates for whom blacks have voted in Supreme Court contests. They have submitted incomplete data concerning the success of judicial candidates for whom members of the Hispanic class have voted.

Despite the actual election results, plaintiffs insist that they have less opportunity than white voters to elect judges of their choice. The reason for this, plaintiffs contend, is that black and Hispanic residents

of Cook County are denied equal access to the political processes which result in candidates being placed on the ballot in judicial elections. Specifically, plaintiffs contend that the Democratic Party slate-makers determine who will be on the ballot and that minority voters have little or no influence in those decisions. Therefore, the choice of candidates at election time usually does not include a candidate they would actually prefer. They are required to choose among candidates foisted upon them by the Democratic slate-makers without regard to the interests or preferences of the black and Hispanic communities. Plaintiffs also assert that most first-time candidates in judicial elections have obtained the advantage of incumbency by way of political appointment to a judicial vacancy, or else have achieved a leg up on the process by reason of a political appointment to an associate judgeship. It is alleged that blacks and Hispanics are generally excluded from the slate-making and appointive processes.

Plaintiffs have submitted a number of affidavits and other materials in support of these contentions. Defendants argue with plaintiffs' conclusions, but plaintiffs clearly have raised genuine issues of fact concerning the exclusionary effect of the slate-making and appointive processes.[1] The question that remains is whether those issues are material to the outcome of the case.

## DISCUSSION

### *The Statute*

Section 2 of the Voting Rights Act of 1965, as amended in 1982, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

A literal reading of the statutory language would lead to the conclusion that plaintiffs have a case. The slating and appointment procedures[2] described by plaintiffs would seem to qualify as "... political processes leading to nomination or election" that are "not equally open to participation" by the plaintiffs, within the meaning of subsection (b) of the statute.[3]

■ Defendants argue that the Voting Rights Act does not reach slate-making, because that is a purely private activity of

---

**1.** This is why we believe plaintiffs were not prejudiced by our protective order which prevented their taking the depositions of various justices of the Illinois Supreme Court and other persons who might have knowledge of the slate-making and appointive processes. Plaintiffs have all the evidence they need to create factual issues relevant to their theory of the case.

**2.** In the remainder of this opinion, unless the context indicates otherwise, "slate-making" will be understood to include not just slate-making

by the Democratic Party but also the process of Supreme Court appointment to judicial vacancies and the appointment of associate judges by circuit court judges.

**3.** At one time, we thought as much. *See Williams v. State Bd. of Elections,* 696 F.Supp. 1563, 1567, n. 5 (N.D.Ill.1988). This was before we had considered the Seventh Circuit opinion in *McNeil, infra.*

the Democratic Party and the Act applies only to state action. Reply Br., p. 14. The scope of the Act is not so narrow. It may be true that a political party is not subject to the Act, but that does not bar relief from the results of private discrimination to the extent they infect the electoral process. *See, e.g., Velasquez v. City of Abilene, Tex.*, 725 F.2d 1017, 1019, 1022 (5th Cir.1984); *Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 499 (5th Cir.1987). *See also White v. Regester*, 412 U.S. 755, 766–67, 93 S.Ct. 2332, 2339–40, 37 L.Ed.2d 314 (1973) (case brought directly under the Constitution).

In amending Section 2 of the Voting Rights Act in 1982, Congress intended to eliminate the "intent" requirement that had been imposed by the Supreme Court in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), and return to the "results" test that had been the law before *Bolden*. Under the latter test, the courts considered a variety of factors in determining whether a challenged election procedure diluted the voting strength of minority groups. The Senate Report on the 1982 amendment listed a number of those factors, including "... [w]hether members of the minority group have been denied access to the slating process...." *See* discussion in *Thornburg v. Gingles*, 478 U.S. 30, 35–37, 106 S.Ct. 2752, 2758–2759, 92 L.Ed.2d 25 (1986). The various factors which make up the "totality of circumstances" relevant to an allegation of vote dilution are often referred to as the "Senate Report" factors or *"Zimmer* factors." [4]

█ In summary, then, both the language of the amended Voting Rights Act and its legislative history suggest that plaintiffs can establish a violation by showing that their lack of access to the slating process usually results in a ballot with no candidates acceptable to them. However, the argument must be considered in light of what the Supreme Court has said about the Act.

### Thornburg v. Gingles

In *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), a group of black citizens of North Carolina challenged an at-large redistricting plan for the state legislature, alleging that the effect of the plan was to dilute their votes in violation of the Voting Rights Act as amended in 1982. The three-judge district court held for the plaintiffs as to all seven districts that were challenged. The Supreme Court, in an opinion written by Justice Brennan, affirmed as to six of the districts, finding that the necessary elements of a Voting Rights Act violation had been proved. The Court reversed as to a seventh district where it found the plaintiffs had not sustained their burden of proof.

The Court discussed the Senate Report factors at length, 478 U.S. at 36–37, 44–45, 106 S.Ct. at 2758–2759, 2762–2764, and concluded that, regardless of how many of those factors were present in a particular case, there are three threshold elements, or "preconditions," a plaintiff has to establish in order to prove a vote dilution claim under the Act:

> While many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice. Stated succinctly, a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group.... These circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons. First, the minority group must be able to demon-

---

**4.** One of the first cases to list the factors was *Zimmer v. McKeithen*, 485 F.2d 1297, 1305–07 (5th Cir.1973) (*en banc*), *aff'd sub nom., East Carroll School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). *See also White v. Regester, supra*, 412 U.S. at 766–67, 93 S.Ct. at 2339–40, upon which the *Zimmer* court relied.

strate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates.... Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, see, *infra*, at 57, and n. 26 [106 S.Ct. at 2775 and n. 26]—usually to defeat the minority's preferred candidate.... In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.

478 U.S. at 48–51, 106 S.Ct. at 2765–2767 (citations omitted).

The precondition that defendants argue has not been satisfied in the present case is the third one, namely "that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ...—usually to defeat the minority's preferred candidate." We will consider the "special circumstances" language in a moment. First, however, we will address the question of whether plaintiffs have presented any evidence from which

we could conclude that the white majority "usually" defeats the "preferred candidate" of the black and Hispanic residents of Cook County. The parties do not argue about the meaning of the word "usually," and, in this context, we understand it to mean more often than not.[5]

■ The evidence on which defendants rely in support of their summary judgment motion is an analysis made by plaintiffs' expert of all judicial contests from the 1984, 1986, and 1988 primary and general elections in which at least one of the candidates was black.[6] Plaintiffs used multivariate regression techniques, and data from most of the county's precincts, to estimate the voting behavior of whites, blacks, and Hispanics in these elections. We can use this data to determine which candidate was supported by a plurality of each ethnic or racial group. In nine of the thirty contests, the black candidate ran unopposed; needless to say, the black-preferred candidate won each of these contests.[7] Of the remaining twenty-one contested elections, the black-preferred[8] candidate won fourteen times, for a success rate of 67 percent (eleven of the successful candidates were black). Plaintiffs' expert has suggested that some of these elections produced unusual results for various reasons,[9] and that eleven of the elections (all primaries) provide the clearest evidence of racial polarization. Even in these eleven "polarized" elections, however, the black-preferred candidate still won seven times, for a success rate of 64 percent. The inevitable conclusion we reach, after considering plaintiff's data in the light most favorable to plaintiffs' argument, is that black voters in county and city judicial elections are usually able to elect the candidate of their

5. This is the relevant definition given by Webster's Third New International Dictionary, unabridged ed. (1971).

6. This analysis was accepted as accurate by the defendants for the purposes of the summary judgment motion.

7. These elections are properly excluded from the analysis, however, because of the "special circumstances" proviso in the third *Gingles* threshold test, discussed *infra*.

8. By "preferred," we mean supported by a plurality or majority of black voters.

9. For example, in two of the elections, Harold Washington, the Mayor of Chicago and a preeminent leader of the black community, endorsed white judicial candidates who were then supported by a plurality of black voters.

choice.[10]

The class of Hispanic plaintiffs has made no effort to demonstrate that the candidates for whom they vote in judicial elections lose more often than not. Instead, they have confined their presentation to an analysis of contests in which one of the candidates was black—i.e., the same contests that are relied upon by the class of black plaintiffs. In some unsworn "observations" submitted by plaintiffs' election expert in a supplemental response to defendants' motion, it is represented that two Hispanic candidates, Ralph Reyna and S. Anthony Perdomo, ran unsuccessfully in the March 1988 Democratic Party primary, despite winning 67.5 percent and 71.4 percent of the Hispanic vote, respectively. Reyna, who was slated by the Democratic Party, was narrowly defeated by another candidate "... due to a combination of black and Anglo voting support." Perdomo's defeat may also have been due in part to his failure to win black support, since we are told that only 10.2 percent of blacks voted for him. Plaintiffs have offered no evidence as to the success rate of judicial candidates for whom Hispanics have voted in the many contests where neither a black nor a Hispanic candidate was on the ballot. Plaintiffs do concede, however, that in races where a Hispanic candidate is not on the ballot, Hispanic voters generally support the candidate who is slated by the Democratic Party.[11] We conclude, therefore, that, like the class of black plaintiffs, the Hispanic plaintiffs have no evidence to support the allegation that white bloc voting usually results in the defeat of the judicial candidates they prefer.

There is no dispute about the fact that the *Gingles* court was referring to the defeat of candidates for whom minority voters cast their ballots in actual elections, as opposed to, say, slating contests. Plaintiffs do not suggest, in other words, that

the usual failure of persons preferred by minority voters to win ballot positions through the slating process could be regarded as white bloc voting that usually defeats the minority's preferred candidate within the meaning of the quoted portion of the *Gingles* opinion. We consider that possibility, not to suggest that the idea has merit, but to make sure that we have not overlooked any way in which discriminatory slating could comply with the third precondition. What makes the idea come to mind in the first place, of course, is plaintiffs' contention that they rarely, if ever, have a "preferred candidate" in the actual election. We think it is quite clear the Supreme Court regarded "the exclusion of members of the minority group from candidate slating processes," a Senate Report factor it referred to earlier in the opinion, 478 U.S. at 45, 106 S.Ct. at 2763, as something different from the situation it was describing in its discussion of the third precondition. The white bloc voting referred to in the precondition cannot be interpreted to include the action of political party slate-makers.

Plaintiffs argue that they *do* comply with the third precondition because slating is the kind of "special circumstance" referred to by the Court. Pl.Brief, pp. 5, 8, 13. We fail to see how the passage from *Gingles* can intelligibly be read in that way. The Court was referring to circumstances that would allow a minority-preferred candidate to win, notwithstanding a degree of white bloc voting that would normally defeat such a candidate. An example of such a circumstance would be a minority-preferred candidate running unopposed. The white bloc, regardless of its strength, would have no one else for whom to vote. In short, the "special circumstances" the Court had in mind were circumstances that would explain the minority's candidate winning the election in spite of white bloc voting. Plaintiffs' argument turns the Court's lan-

---

**10.** Since the parties have not submitted data concerning elections in which no black candidate was on the ballot, we can only infer the success rate of candidates supported by black voters in those elections. Counsel for plaintiffs conceded at oral argument that, when a minority candidate is not on the ballot, both black and

Hispanic voters usually support the candidate slated by the Democratic Party. In Cook County, such candidates are elected considerably more often than not.

**11.** *See* Note 9, *supra.*

guage on its head and would have it refer to circumstances explaining the *defeat* of the minority's candidate, such as exclusionary slating.

Plaintiffs' interpretation of the third *Gingles* precondition is consistent with their argument that "these threshold requirements should not be viewed by this court as countermanding or replacing the 'totality of circumstances' explicitly stated in the Voting Rights Act nor the objective factors incorporated in the Senate Report derived in large part from *Zimmer v. McKeithen,* and *White v. Register.* [*Regester*]" Pl.Brief, pp. 14–15. It is true that *Gingles* did not "countermand" or "replace" the *Zimmer* or Senate Report factors. They continue to be important, and much of the Court's discussion in *Gingles* was addressed to the matter of how the presence of these factors in the case supported the district court's finding that there had been racial bloc voting.[12] However, whether the additional factors can be proved or not, the three "preconditions" must be proved or there is no case under the Act. It is difficult to see how the Court could have expressed itself more clearly. But if there was ever any doubt about how this court should apply the three "necessary preconditions," it has been dispelled by the Court of Appeals for this Circuit.

### *McNeil v. Springfield Park Dist.*

Black voters residing in Springfield, Illinois brought suit under the amended Act challenging the electoral systems for the Springfield school district and park board. Plaintiffs alleged that the at-large elections held for seats on these boards unlawfully diluted the voting strength of black voters, preventing them from electing representatives of their choice. The black population of both districts was approximately 9 per-

cent. Plaintiffs asked the district court to divide the park and school districts into seven single-member districts each, so that there would be one park district and one school district each with a black population of about 50 percent. The voting age population of those two districts, however, was to be only about 43 percent. The district court granted summary judgment for defendants, interpreting the first precondition of *Gingles* to require a majority of the *voting age* population in the proposed single-member district, and held that, since plaintiffs could not meet that requirement, there was no genuine issue of material fact. *McNeil v. Springfield Park Dist.,* 666 F.Supp. 1208 (C.D.Ill.1987) (Mills, J.). The Seventh Circuit affirmed and, in the course of its opinion, commented at length on the specific problem now before us, namely, whether the presence of *Zimmer* factors can carry the day for a plaintiff who cannot prove the existence of the three *Gingles* preconditions. The court described the *Gingles* holding as follows:

While agreeing that many or all of the *White/Zimmer* factors are relevant to a claim that multi-member districts violate section 2, the Court established "necessary preconditions" that have to be met before such claims receive full consideration. *Gingles,* 106 S.Ct. at 2766. To pass the summary judgment threshold, a minority group "must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* The group must also show that it is politically cohesive and that white bloc voting usually thwarts election of the minority's preferred candidate. Only upon satisfaction of these threshold criteria should a court conduct its totality-of-the-circumstances analysis and consider other relevant factors set forth in *White* .... Thus, although a section 2 claim

---

**12.** If proof of the three preconditions establishes a Voting Rights Act case, then what need is there to go further and prove the existence of any of the Senate Report factors? Justice O'Connor raised this question in her concurring opinion, offering the answer that

[T]hese other factors may be supportive of such a claim, because they may strengthen a

court's confidence that minority voters will be unable to overcome the relative disadvantage at which they are placed by a particular districting plan, or suggest a more general lack of opportunity to participate in the political process.

478 U.S. at 93, 106 S.Ct. at 2788.

potentially implicates many factors, the Court stated in no uncertain terms that a challenge to a multi-member district cannot be sustained unless the *Gingles* preconditions are met.

*McNeil v. Springfield Park Dist.*, 851 F.2d 937, 942 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989).

*McNeil* dealt with the first *Gingles* precondition, whereas we are concerned in this case only with the third. Plaintiffs, to their credit, do not attempt to argue that *McNeil* is distinguishable on that ground. Rather, they repeat their argument that they come *within Gingles* because of the "special circumstances" they are prepared to prove. Pl.Brief, p. 12–13. As explained above, we believe plaintiffs misinterpret the clear language of *Gingles.*

Plaintiffs have cited several cases in support of their view that the *Zimmer* factors —specifically, slating—survive *Gingles* to provide a sufficient predicate for liability under the Act. We think the cases are inapposite. *White v. Regester, supra,* is of no help to plaintiffs on this particular point, since it did not involve the Voting Rights Act and, of course, is pre-*Gingles.* In *Citizens for a Better Gretna v. City of Gretna, La., supra,* decided after *Gingles,* all three of the *Gingles* preconditions were met. The case does not support the proposition that a plaintiff can prevail without establishing each of the three preconditions. *Velasquez v. City of Abilene, supra,* was another pre-*Gingles* case. *Jackson v. Edgefield County School Dist.,* 650 F.Supp. 1176 (D.S.C.1986), is another case in which the three *Gingles* preconditions were met: "... [w]e now conclude that the plaintiffs have met the three-part analysis set out in *Thornburg v. Gingles, supra,* necessary for proving a vote dilution case under section 2 of the Voting Rights Act." *Id.* at 1201.[13] Similarly, in *Collins v. City of Norfolk, Va.,* 816 F.2d 932, 935 (4th

Cir.1987), the court discussed the three preconditions established by *Gingles* that plaintiffs must show "as a threshold matter."

In summary, we think there can be no doubt that *Gingles* and *McNeil* require this court to hold that plaintiffs must prove, as an essential part of their case, that white bloc voting usually results in the defeat of the candidates for whom black and Hispanic voters cast their ballots in judicial elections.

*The Equities*

Plaintiffs argue that to grant defendants' motion would be "to announce to an astonished world, that as a matter of law, there is no polarized voting in Chicago and Cook County judicial elections." Pl.Brief, p. 42. This is not a fair statement of the matter. The court is making no finding in regard to the existence of racial bloc voting, except to consider that it is a genuinely contested issue in this case. But racial bloc voting is merely a prerequisite to the third precondition. The white bloc voting must usually result in the defeat of the minority's preferred candidate, and the undisputed evidence in this case shows that this does not occur. As far as the astonishment of the world is concerned, perhaps the question is whether the *Gingles* preconditions, when fully understood, are really so startling.

The Voting Rights Act is not an easy statute to apply. Like most products of compromise, its internal consistency is imperfect. Subsection (b) of the 1982 amendment provides that a violation is established if members of a racial minority "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." As noted earlier in this opinion, the language of the amendment seems to support the proposition that unequal ac-

**13.** The *Jackson* court clearly understood the difference between the three preconditions and the Senate Report factors:
  While the legislative history indicates that Congress did not articulate the distinction between the 'primary' and 'enhancing' factors in the amended section 2, it seems clear that the *Thornburg* court has treated the evidentiary value of polarized voting and minority electoral success as a matter of primary importance in the section 2 vote dilution case.
  650 F.Supp. at 1202, n. 10.

cess to the slating process would establish a violation. Moreover, some language in the amendment could, standing alone, be reasonably taken to mean that minorities are entitled to proportional representation. However, the amendment ends with the proviso that "... Nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." The reconciliation of this proviso with the other language of the amendment is not self-evident. Interpretation is required. This is the task to which the majority addressed itself in *Gingles*. Justice O'Connor thought the majority went too far in favoring minorities. In her concurring opinion, joined by Chief Justice Burger and Justices Powell and Rehnquist, she criticized the three preconditions established by the majority, arguing that, under the majority's analysis, compliance with those preconditions would create a right to roughly proportional representation, contrary to the intent of the statute. 478 U.S. at 91, 106 S.Ct. at 2787.

Like the statute itself, the opinion Justice Brennan wrote for the majority in *Gingles* does not satisfy everyone. But as Judge Cudahy stated in *McNeil:*

> ... given the lack of clarity with respect to the requirements for a section 2 violation, as well as the broad latitude often granted to courts having to consider the totality of the circumstances, *Gingles* is a reasonable exercise of the Court's authority in statutory interpretation. The Court's approach, by focusing up front on whether there is an effective remedy for the claimed injury, promotes ease of application without distorting the statute or the intent underlying it. It reins in the almost unbridled discretion that section 2 gives the courts, focusing the inquiry so that plaintiffs with promising claims can develop a full record. The creation of preconditions—a choice of clear rules over muddy efforts to discern equity—shields the courts from meritless claims and ensures that clearly meritorious claims will survive summary judgment. That might not always have been true had courts been allowed to consider

all of the *White/Zimmer* factors at the early stages of the proceedings. Thus, although in this case the *Gingles* criteria might conceivably foreclose a meritorious claim, in general they will ensure that violations for which an effective remedy exists will be considered while appropriately closing the courthouse to marginal cases. In making that trade-off, the *Gingles* majority justifiably sacrificed some claims to protect stronger claims and promote judicial economy. The Voting Rights Act is a crucially important piece of national legislation, *see Derrickson v. City of Danville*, 845 F.2d 715, 723–24 (7th Cir.1988) (Cudahy, J., concurring), but it is subject to the same considerations of effective administration as other similar statutes.

*McNeil v. Springfield Park Dist.*, 851 F.2d at 942–43. It is understandable that plaintiffs in this case believe they are hurt by the trade-off. They do not regard their claim as a marginal one, and see nothing speculative about their alleged lack of access to the slating process. That lack of access, they claim, results directly in their inability to elect judges of their choice.

There may be merit to plaintiffs' argument. On the other hand, it may not be that clear. Underlying their argument are three premises: First, slating is essential to election. Second, candidates preferred by blacks and Hispanics are not slated. Third, only the elimination of the at-large election system and the creation of smaller districts in which plaintiffs would constitute substantial majorities would result in the election of judges who are the actual choices of black and Hispanic voters.

The first premise is undermined by the undisputed fact that a number of unslated judicial candidates have won election to the Circuit Court of Cook County in recent years, including several blacks strongly supported by the black community. No slated candidate has won election to the Supreme Court of Illinois from Cook County in the last three elections. The second premise is undermined by the fact that black candidates are regularly slated by the Democratic organization. Those candi-

dates generally command strong black support and usually win (although, admittedly, they are more likely to lose than white slated candidates). As far as the third premise is concerned, it is possible that smaller districts would result in a more responsive slate-making process, or that districts in which minorities constituted strong majorities would be more fertile fields for unslated candidates. But the materials submitted by plaintiffs in opposition to defendants' motion suggest little reason to believe that the political processes that would lead to the selection of judicial candidates in smaller districts would necessarily respond to the actual preferences of minority voters.

All we are suggesting here is that the *Gingles* preconditions are not necessarily frustrating the presentation of what would otherwise be a winning case. The situation is somewhat like that presented in *McNeil*, where the plaintiffs argued in the alternative that they should be exempted from the precondition that they constitute a majority of the voting population in the proposed districts. Their argument was that, because only a *plurality* was necessary to win election, their 43 percent of the voting population should be considered sufficient to avoid summary judgment. Plaintiffs contended that more than two candidates would usually run for each position, increasing the likelihood that the black voters, by concentrating on one candidate, could elect their choice. The Court of Appeals noted that in *Gingles* a majority vote was required to win. In that context, "... the Court's requirement that a minority group constitute a majority in a single member district makes sense." 851 F.2d at 943. While observing that in the case before it "... the precondition is more troubling," *id.*, the Court nonetheless rejected plaintiffs' argument. The analysis of the Court is relevant to the case at bar:

> Movement away from the *Gingles* standard invites courts to build castles in the air, based on quite speculative foundations. In our view, the Court based its brightline requirement on a plausible scenario under which courts can estimate approximately the ability of minorities in a single-member district to elect candidates of their choice. Other scenarios are, of course, possible, but *that possibility alone is not a good reason* to destroy the interest in clarity and uniformity furthered by a brightline test. No one has presented a statistical probability distribution of the variations from the *Gingles* model in Springfield Park District or School District elections but variations favoring minorities might well be offset by variations favoring whites.

> To prove a section 2 violation, the potential to elect *must be solid and substantial*. It cannot be speculative. Blacks comprising less than a majority in a district *would not necessarily* have the requisite potential to elect their candidates of choice. In the elections at issue here, even if all eligible black voters supported a single candidate in the proposed single-member district, that candidate *would not be assured* of electoral success. A sole challenger, supported by a bloc of white voters, would win.

> As we have noted, there are many circumstances, including the existence of cross-over voting proclivities and various combinations of majority and minority candidates, that might strongly affect the electoral prospects of minority candidates. We believe, however, that the Supreme Court acted within the most obvious electoral context in promulgating the *Gingles* rule. We think the Court did not intend for the rule to be ignored or sharply modified in light of the somewhat different electoral conditions presented here. We therefore hold that the absence of a majority vote requirement here does not remove this case from the ambit of the *Gingles* requirements.

851 F.2d at 944 (emphasis added).

### Summary Judgment Standard

There are factual disputes in this case, but where plaintiffs have no evidence to support an essential element of their claim, summary judgment is appropriate:

> In our view, the plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

## CONCLUSION

Because there is no genuine issue of material fact, defendants' motion for summary judgment will be granted.